THE HONORABLE BARBARA J. ROTHSTEIN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SIGNAL 88, LLC, a Delaware limited liability company, | Case No. 2:25-cv-01156-BJR |
| Plaintiff, | **FIRST AMENDED COMPLAINT FOR BREACH OF CONTRACT; TORTIOUS INTERFERENCE WITH CONTRACT; BREACH OF GUARANTY; BREACH OF IMPLIED COVENENT OF GOOD FAITH AND FAIR DEALING; MISAPPROPRIATION OF TRADE SECRETS 18 U.S.C. § 1836; UNJUST ENRICHMENT** |
| v. | |
| SEAN "BRAD" MASTERSON, an individual; EYEY LLC, a Washington limited liability company; NORTHERN SKY, LLC, a Washington limited liability company; WASHINGTON SECURITY SERVICES INC., a Washington corporation, | <u>**JURY DEMAND**</u> |
| Defendants. | |

Plaintiff Signal 88, LLC ("Signal") alleges as follows:

<u>**INTRODUCTION**</u>

1.      This case concerns a dispute between Signal, a nationally recognized private security franchisor, and the defendants who grossly mismanaged a now-defunct Signal franchise known as "Franchise 366." Defendant Sean Bradford Masterson ("Masterson") served as the principal for Franchisee Defendants—Northern Sky, LLC ("Northern Sky"), Washington Security Services, Inc. ("Washington Security") and EYEY LLC ("EYEY"). Masterson used Franchisee Defendants to contract with Signal for the purchase of Franchise 366. But Masterson also used Franchisee Defendants as part of a fraudulent shell game to mislead lenders, including Signal, into believing Franchise 366 was profitable in order to obtain loans that neither Masterson nor

BALLARD SPAHR LLP
1301 2nd Ave, Suite 2800
Seattle, WA 98101-3808
Telephone: 206.223.7000
FAX: 206.223.7107

Franchisee Defendants could repay.  When Masterson sensed that Signal was on the brink of discovering his defalcations and severe mismanagement of Franchise 366, Masterson used Franchisee Defendants to misappropriate Signal's trade secrets and other confidential and proprietary information, and to interfere with Signal's business expectancies and contracts, so that Masterson could open a competing business through EYEY, doing business as "All Time Guard."

2.     Signal brings this lawsuit against Defendants to recover the millions of dollars that Franchisee Defendants borrowed from Signal and, after default, owe under the various contracts, including Masterson's continuing personal guaranty. Signal also seeks additional damages for Defendants' other breaches of contract, and for their unlawful conduct in misappropriating trade secrets, unjust enrichment, and their intentional and unjustified sabotage of Signal's valuable customer relationships and business expectancy.

## PARTIES, JURISDICTION, AND VENUE

3.     Plaintiff Signal is a Delaware limited liability company, with its principal place of business in Omaha, Nebraska.

4.     Defendant Masterson is citizen of King County, Washington.

5.     Defendant EYEY is a Washington limited liability company, with its principal place of business in King County, Washington. EYEY's sole member is Masterson.

6.     Defendant Northern Sky is a Washington limited liability company, with its principal place of business in King County, Washington. Northern Sky's sole member is Masterson.

7.     Defendant Washington Security is a Washington corporation with its principal place of business in King County, Washington.  Masterson is the sole officer and director of Washington Security Services.  According to public records, Masterson caused Northern Sky to "merge" into Washington Security on or about October 2021. Signal treats the entities separately for purposes of pleading to the extent that merger was improper, unlawful, or invalid.

PLAINTIFF'S FIRST AMENDED COMPLAINT – 2
Case No. 2:25-cv-01156-BJR

**BALLARD SPAHR LLP**
1301 2nd Ave, Suite 2800
Seattle, WA 98101-3808
Telephone: 206.223.7000
FAX: 206.223.7107

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds the sum or value of $75,000, exclusive of interests or costs, and is between citizens of different states.

9.      Additionally, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Signal asserts a claim under 18 U.S.C. § 1836 *et seq*., the federal Defend Trade Secrets Act ("DTSA").

10.     This Court has personal jurisdiction over Masterson because he is a citizen of King County, Washington, which falls within this Court's juridical district.

11.     This Court has personal jurisdiction over EYEY because it is a Washington limited liability company doing business in King County, Washington, and its sole member, Masterson, is a citizen of King County, Washington.

12.     The Court has personal jurisdiction over Washington Security because it is a Washington corporation doing business in King County, Washington, which falls within this Court's juridical district.

13.     The Court has personal jurisdiction over Northern Sky because it is a Washington limited liability company doing business in King County, Washington, and its sole member, Masterson, is a citizen of King County, Washington.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Masterson resides within this juridical district.

15.     The operative agreements at issue in this action contain choice of law provisions identifying the substantive law of Nebraska for claims pursuant to the agreement. Accordingly, all claims arising out of the franchise relationship are asserted herein under Nebraska law, or federal law where appropriate.

## **FACTUAL ALLEGATIONS**

### **The Parties' Contracts to Purchase and Sell Franchise 366**

16.     Through Franchisee Defendants, Masterson served as the principal for and person in charge of operating Franchise 366.

BALLARD SPAHR LLP
1301 2nd Ave, Suite 2800
Seattle, WA 98101-3808
Telephone: 206.223.7000
FAX: 206.223.7107

17.     To effectuate the franchisee relationship and purchase Franchise 366, on or about August 13, 2021, Northern Sky and Signal executed a Franchise Agreement ("Northern Sky Franchise Agreement").  Masterson, the sole owner of Northern Sky, guaranteed Northern Sky's performance pursuant to the Northern Sky Franchise Agreement and related contracts by executing, among other documents, a Continuing Unconditional Guaranty.  Northern Sky's initial purchase was for a small territory west of Seattle and south of Puget Sound.

18.     Signal and Northern Sky also entered into a Financing Agreement with Signal to fund day-to-day operations via a line of credit ("Operations Financing  Agreement") (Exhibit 1), pursuant to which Signal agreed to "loan to Franchisee… such principal amounts as Franchisee may request in order to meet the costs of conducting the normal business of Franchisee's business," so long as (i) "such costs are ordinary, reasonable, and necessary to the operation of the Franchisee's business, as determined by Franchisor in its sole discretion;" and (ii) "Franchisee meets Franchisor's credit qualifications at the time of each advance." (Ex. 1, at 1).

19.     As part of the Operations Financing Agreement, Northern Sky also executed an assignment of contracts agreement whereby Northern Sky assigned all right, title and interest in its customer accounts and accounts receivable to Signal, and a promissory note to ensure repayment of moneys borrowed by Northern Sky from Signal.

20.     Northern Sky also entered into a security agreement, wherein Northern Sky agreed to grant a security interest in assets owned by Northern Sky to secure repayment of any debt from Northern Sky to Signal.

21.     Additionally, Northern Sky entered into another, separate financing agreement with Signal to fund part of the franchise fee for the purchase of a geographical "Territory" in which to operate the Franchise, and a portion of the franchise fee was funded by a loan from Signal.

22.     On September 23, 2021, Northern Sky transferred its rights and obligations under the Northern Sky Franchise Agreement to Washington Security with Signal's consent. ("First Consent to Transfer") (Exhibit 2).   As consideration for this transfer, Masterson agreed that he continued to personally guarantee all of Franchise 366's obligations.  (*Id.*)

BALLARD SPAHR LLP
1301 2nd Ave, Suite 2800
Seattle, WA 98101-3808
Telephone: 206.223.7000
FAX: 206.223.7107

23.    For the first several months of operating Franchise 366, Masterson delivered positive reports to Signal regarding Franchise 366's operations and success and pressed Signal to support Franchise 366's expansion.

24.    On May 26, 2022, as part of Signal's rebranding efforts, Washington Security and Signal entered into a new Franchise Agreement ("Franchise Agreement") so that Washington Security could expand the territory serviced by Franchise 366 into significant parts of Seattle. (Exhibit 3).  The Franchise Agreement became the effective franchise agreement governing the franchise relationship between Signal and Washington Security, instead of the previously assigned Northern Sky Franchise Agreement.

25.    In order to finance Washington Security's franchise fees for its expanded territories, Signal advanced a series of loans to Washington Security until January 1, 2023, when Washington Security and Signal entered into a Financing Agreement to consolidate all such franchise fee-related debts from Washington Security to Signal (the "Franchise Fee Financing Agreement"). (Exhibit 4.)

26.    Pursuant to the Franchise Fee Financing Agreement, Washington Security agreed to pay Signal $3,133,214.24. (Ex. 4). In executing the Franchise Fee Financing Agreement, Washington Security agreed to the following: "Franchisee hereby (a) reaffirms and admits the validity and enforceability of the Franchise Agreement and all obligations under the Franchise Agreement . . . ."

27.    On August 28, 2023, Washington Security transferred all rights, assets, and obligations under the Franchise Agreement and related contracts to EYEY, except for vehicles, which Washington Security retained. ("Second Consent to Transfer") (Exhibit 5). Once again, Signal agreed to allow Masterson to transfer Franchise 366 from one company to another, and Masterson executed another unconditional guaranty as part of the transfer.

28.    Masterson signed at least three Continuing Unconditional Guaranty agreements (collectively, the "Guaranties") pursuant to which Masterson agreed that he: (i) "absolutely and unconditionally guarantees to [Signal] full and prompt payment of all Indebtedness … owing

PLAINTIFF'S FIRST AMENDED COMPLAINT – 5
Case No. 2:25-cv-01156-BJR

**BALLARD SPAHR LLP**
1301 2nd Ave, Suite 2800
Seattle, WA 98101-3808
Telephone: 206.223.7000
FAX: 206.223.7107

from" Northern Sky, Washington Security, and EYEY; and (ii) "agrees to be personally bound by, and personally liable for the breach of, each and every provision in the franchise agreement." (Exhibit 6.)

### Defendants Disclose that they Overleveraged Franchise 366
### Without Signal's Knowledge or Consent

29.     After the transfer to EYEY occurred, Masterson disclosed to Signal that he and Washington Security were in default on several loans with third-party lenders and had been sued pursuant to those defaults.  Masterson had not obtained consent from Signal to encumber Franchise 366 in this manner, in violation of the Franchise Agreement.

30.     When Masterson informed Signal about the defaulted loans and litigation, he did not initially disclose to Signal that he and Washington Security obtained the subject loans by fraudulently pledging assets to the third-party lenders that he and Washington Security had *already* assigned and pledged to Signal to secure repayments of its loans to Franchise 366.

31.     Masterson presumably only disclosed the defaulted loans and litigation to Signal because he knew Signal would find out when the third-party lenders tried to foreclose on the assets that secured Signal's loans.  With proverbial hat in hand, Masterson asked Signal to loan him approximately $500,000 to pay off the past due loans to the third-party lenders and settle the litigation matters with those lenders.  Unaware at the time that Masterson had procured the loans by fraudulently pledging assets assigned to Signal and secured by its security agreement, Signal agreed to lend defendants the funds.  Understandably, however, Signal became concerned about the financial health of Franchise 366 and began to investigate.

### Fearing Termination of Franchise 366, Defendants Sabotage Signal's Reputation and
### Attempt to Open a Competing Business.

32.     Masterson knew Signal would eventually discover his misconduct and became concerned that Signal might terminate Franchise 366.

PLAINTIFF'S FIRST AMENDED COMPLAINT – 6
Case No. 2:25-cv-01156-BJR

**BALLARD SPAHR LLP**
1301 2nd Ave, Suite 2800
Seattle, WA 98101-3808
Telephone: 206.223.7000
FAX: 206.223.7107

33.    Masterson began making plans to abandon Signal with the debts Defendants owed it, usurp Signal's customers, proprietary know-how, and trade secrets, and start his own competing security business through EYEY doing business as All Time Guard.

34.    Through EYEY, Masterson thereafter set up a separate competing security business doing business as "All Time Guard," which falsely advertised itself as being "partnered" with Signal, and began misappropriating troves of Signal's trade secrets.

35.    To further distract from his own misdeeds and rampant violations of the Franchise Agreement and other contractual obligations to Signal, Masterson began falsely accusing Signal of failing to comply with Washington law to anyone who would listen, including Signal's customers.

36.    Going even further, on August 5, 2024, Masterson and Franchisee Defendants filed a lawsuit in King County Superior Court *against Signal,* its affiliated companies, its chief executive officer, and several others ("King County Action").

37.    By filing the King County Action, Defendants breached the Franchise Agreement yet again. The express language in the Franchise Agreement required Defendants to notify Signal of a dispute and engage in good-faith mediation prior to commencing any legal action, which Defendants had not done.

38.    Signal demanded that Defendants voluntarily dismiss the lawsuit and proceed to mediation pursuant to the unambiguous terms of the Franchise Agreement, but Defendants adamantly refused, opting instead to litigate and continue with its unlawful efforts to take Signal's customers and open a rival security company.

39.    On August 19, 2024, pursuant to Signal's obligation to provide the franchisee with a formal notice and an opportunity to cure defaults, Signal sent Defendants a formal Notice of Default of Franchise Agreements and Lending Agreements; Demand to Cure; Demand for Documentation. ("Notice of Default") (Exhibit 7).

BALLARD SPAHR LLP
1301 2nd Ave, Suite 2800
Seattle, WA 98101-3808
Telephone: 206.223.7000
FAX: 206.223.7107

40.     On September 11, 2024, Masterson used one of Signal's software vendors to export 20,271 confidential, proprietary and trade secret records belonging to Signal including its confidential customer list.

41.     Masterson and EYEY then used the list to contact Signal's customers. Masterson and EYEY falsely told the customers that Signal was "going away" and/or operating illegally and requested the customers to sign a new contract with All Time Guard. Masterson and EYEY falsely assured Signal's customers that everything was staying the same, and that the task was merely administrative, for "compliance" reasons. In the end, Defendants' conduct and false and misleading communications with Signal's customers sabotaged Signal's relationships with approximately 60 customers, causing Signal substantial damages.

42.     On September 20, 2024, Signal terminated the Franchise Agreement and related contracts based on the myriad defaults outlined in the Notice of Default and Defendants' efforts to misappropriate Signal's proprietary business model and customers.

43.     On February 26, 2025, after months of senseless and wasteful litigation propagated by Masterson, the court in the King County Action entered an order dismissing Defendants' lawsuit for failing to abide by the unambiguous contract terms requiring mediation prior to commencing legal action ("Dismissal Order"). The court also ordered that Defendants stop litigating until they complied with their obligations to mediate in good faith. Masterson never did stop, and eventually the court sanctioned him for disobeying the Dismissal Order and other court orders, and engaging in litigation tactics that were "wasteful and abusive for both the Court and" Signal.

44.     Despite Defendants' recalcitrance, the parties attended a mediation on June 20, 2025, but that mediation failed to resolve the parties' disputes. Signal now brings this lawsuit to hold Defendants accountable for various breaches of the Franchise Agreement, Operations Financing Agreement, Franchise Fee Finance Agreement, Guaranties, and other actions that have caused damage to Signal. Signal has satisfied any of its own prelitigation obligations and conditions precedent required to bring this lawsuit.

BALLARD SPAHR LLP
1301 2nd Ave, Suite 2800
Seattle, WA 98101-3808
Telephone: 206.223.7000
FAX: 206.223.7107

**Defendants Materially Breached the Agreements With Signal in Innumerable Ways**

45.     Defendants have breached multiple provisions of the Franchise Agreement and related contracts as specified more fully below.

**EYEY and Masterson's Creation of a Competitive Security Service**

46.     Without Signal's knowledge or consent, Masterson set up a competing business through EYEY while EYEY was under contract with Signal, and Masterson had guaranteed EYEY's performance.  Initially, Masterson and EYEY doing business as All Time Guard operated a security camera and monitoring business that purported to use "live agent monitoring" of its clients' businesses and property. The All Time Guard website stated that it was owned and operated by EYEY, and falsely claimed that it was "partnered" with Signal. For the avoidance of any doubt, All Time Guard was not affiliated with or sanctioned by Signal in any way.

47.     In an effort to boost credibility, the All Time Guard website listed Signal's trademark in advertising its competitive services, and spanned its operations across and beyond the geographical territory expressly allowed in the Franchise Agreement to EYEY.

48.     To get a head start on his competitive new business, Masterson downloaded multiple proprietary databases from Signal's internal computer systems and began to leverage that information to contact Signal's customers and potential customers listed in the database. On multiple occasions, Masterson and EYEY attempted improperly to poach Signal's customer and replicate Signal's business model using Signal's confidential and proprietary information and trade secrets, all with the goal of expanding All Time Guard into a full security company competing directly with Signal.

49.     Signal's customer list, business development plan, and security business structure and plan are proprietary trade secrets that are kept closely guarded. This fact is expressly accounted for in the Franchise Agreement itself. (Ex. 3 § 1.16 "Trade Secrets"). The Trade Secrets are disclosed on a limited basis to certain Signal employees and franchisees, but those Trade Secrets are kept strictly confidential based on a competitive edge that they provide in the security services market, which is of significant economic value. (*Id.*).

PLAINTIFF'S FIRST AMENDED COMPLAINT – 9
Case No. 2:25-cv-01156-BJR

**BALLARD SPAHR LLP**
1301 2nd Ave, Suite 2800
Seattle, WA 98101-3808
Telephone: 206.223.7000
FAX: 206.223.7107

50.     All individuals with access to the Trade Secrets sign a confidentiality agreement. And indeed, Masterson and the Franchisee Defendants expressly agreed to keep the Trade Secrets confidential. (*Id*., § 16.1 (Confidential Information: "Franchisor possesses certain confidential information, which includes all (a) Trade Secrets and proprietary information that pertains to Franchisor's business and is disclosed or obtained, known, generated, or observed by Franchisee as a consequence of the parties' relationship under this Agreement.")).

51.     With full knowledge of the nature, value, and confidentiality of the Trade Secrets, Masterson and EYEY willfully and wrongfully exceeded their authorization to download, use, and exploit the Trade Secrets for his own purposes in interstate commerce. Specifically, Masterson and EYEY used the Trade Secrets to identify, contact, and solicit customers from Signal's resources, and they did so in a manner and method that misappropriated Signal's business practices and proprietary strategies.

52.      In so doing, Masterson and EYEY caused damages to Signal for which Signal is entitled to recover.

53.     The actions of Masterson and EYEY relating to All Time Guard also materially breached multiple unambiguous provisions of the Franchise Agreement.

54.     Section 6.5(e) of the Franchise Agreement provides "[a]t all times during the operation of the Franchised Business, Franchisee will sell and perform only such Services as Franchisor has approved, as set forth in the Franchise Performance Manual. Franchisee may not at any time provide armed security services, unless Franchisor expressly approves the performance of such armed Services in writing and Franchisee meets all legal requirements and any conditions Franchisor may establish before performing any such armed Services." (Ex. 3).

55.     Masterson and EYEY's creation and operation of All Time Guard, a separate entity that directly competes with Signal in the provision of security services, is a direct and material breach of Section 6.5(e) of the Franchise Agreement for which Signal is entitled to relief.

56.     Section 6.6(e) provides "Franchisee must not use, display, publish, broadcast, or otherwise disseminate in any manner any advertising or marketing materials other than the

Promotional Materials unless Franchisor has first approved in writing that Franchisee may use, display, publish, broadcast, or otherwise disseminate such advertising or marketing materials. Franchisor may approve or disapprove any such materials and may revoke its approval at any time in its sole discretion without prior notice." (*Id.*)

57.     Masterson and EYEY's display of Signal's registered trademarks for purposes of advertising for a rival security service, All Time Guard, is a direct and material breach of Section 6.6(e) of the Franchise Agreement for which Signal is entitled to relief.

58.     Section 2.2 of the Franchise Agreement provides, in relevant part: "Franchisee acknowledges and agrees that the license and franchise grant in Section 2.1 of this Agreement is expressly limited to the Territory and that Franchisee may not use the Marks, the System, the Promotional Materials or any other indicia of the Franchised Business owned or licensed by Franchisor and may not perform any Services in any other jurisdiction or geographical area other than the Territory, without first requesting permission in writing and obtaining written permission from Franchisor to do so, which permission may be withheld in the sole discretion of Franchisor." (*Id.*)

59.     Masterson and EYEY's usage of Signal's marks and promotional materials for All Time Guard's operations outside of the defined territory constitutes a material breach of the Franchise Agreement for which Signal is entitled to relief.

60.     Section 17.2 of the Franchise Agreement provides:

> In consideration of the Franchisor's disclosure of its System and Confidential Information, Franchisee agrees that during the term of this Agreement and for a period of two (2) years after the termination or expiration of this Agreement, Franchisee, will not:
>
> > (a) engage in or have an interest in, whether directly, indirectly, individually or as a member of any business organization, or whether as an employee, owner, investor, partner (inactive or otherwise), agent, stockholder, director or officer of a corporation or other business entity, the provision or sale of Services sold by the Franchised Business within a distance of seventy-five (75) miles, or the maximum distance allowed by law, whichever is less, of the Territory or any other franchisee of Signal 88, LLC; or

**BALLARD SPAHR LLP**
1301 2nd Ave, Suite 2800
Seattle, WA 98101-3808
Telephone: 206.223.7000
FAX: 206.223.7107

(b) solicit business from customers of Franchisee's former Franchised Business or contact any of Franchisor's suppliers or vendors for any competitive business purpose, nor solicit any employees of Franchisor, its affiliates or System franchisees to cease their employment with Franchisor, its affiliates or System franchisees.

(*Id.*)

61.     The creation and operation of All Time Guard by Masterson and EYEY is a direct and material breach of Section 17.2 of the Franchise Agreement for which Signal is entitled to relief.

62.     Section 6.17 of the Franchise Agreement provides, in relevant part: "Franchisee must have and maintain adequate hardware and software in order to access the Internet at the bit speed Franchisor requires from time to time. Franchisee is prohibited, however, from establishing any website or other presence on the Internet, except as provided herein. The only domain names and Sites that Franchisee may use relating to the Franchised Business are those assigned or approved by Franchisor in writing."

63.     Masterson and EYEY's creation and operation of All Time Guard's website advertising the provision of competing security services, including Signal's marks, is a direct and material breach of Section 6.17 of the Franchise Agreement for which Signal is entitled to relief.

64.     Further, Masterson's conduct in creating an operating All Time Guard was a direct and material breach of Sections 2.3, 2.4, and 2.5 of the Franchise Agreement, which reserve exclusive rights to Signal to enter contracts with customers.

### Failure to Pay Service Fees

65.     Masterson and EYEY were formally notified of the multiple defaults under the Franchise Agreement back in August of 2024, and they have failed or refused to cure.

66.     Section 5.7 of the Franchise Agreement provides, in relevant part:

In the event that Franchisor notifies Franchisee of a default under the Franchise Agreement and Franchisee fails to cure the default within thirty (30) days after such notice, Franchisor shall be entitled to service fees in an amount determined in accordance with Exhibit C-1 for services rendered by Franchisor or its authorized agent as a result of the default.

(*Id.*)

**BALLARD SPAHR LLP**
1301 2nd Ave, Suite 2800
Seattle, WA 98101-3808
Telephone: 206.223.7000
FAX: 206.223.7107

67.     Under Section 5.7 of the Franchise Agreement, Signal is therefore entitled to the service fees as contemplated in Exhibit C-1 of the Franchise Agreement.

68.     To date, Masterson and EYEY have paid none of the service fees due and owing under Section 5.7 of the Franchise Agreement. This is a material breach of the Franchise Agreement for which Signal is entitled to relief.

**Incurring Franchisee Debt without Signal's Approval**

69.     Despite express prohibitions, notice, and consent requirements for external debt under the Operations Financing Agreement and Franchise Fee Financing Agreement (collectively, the "Financing Agreements"), Defendants took out loans from third parties without the knowledge or consent of Signal.

70.     Further, and again in direct breach of the Financing Agreements, Defendants pledged assets, including their customer accounts and accounts receivable assigned to Signal, as collateral for those unauthorized loans on at least 12 separate occasions.  Defendants made those pledges knowing that they had already assigned and pledged those same assets to Signal as security to ensure repayment of the debts Defendants owed to Signal.

71.     Each lender filed UCC financing statements against Defendants pursuant to those obligations, including the following:

- November 2, 2021 - UCC Financing Statement filed by Seattle Economic Development Fund against Washington Security Services, Inc.;

- September 22, 2022 - UCC Financing Statement filed by Verity Credit Union against Washington Security Services, Inc.;

- November 4, 2022 - UCC Financing Statement filed by Global Merchant Cash Inc against Washington Security Services Inc.;

- February 9, 2023 - UCC Financing Statement filed by Seattle Economic Development Fund against Washington Security Services Inc.;

- March 8, 2023 - UCC Financing Statement filed by Global Merchant Cash Inc. against Washington Security Services Inc.;

- June 8, 2023 - UCC Financing Statement filed by Dell Financial Services L.L.C. against Washington Security Services, Inc.;

**BALLARD SPAHR LLP**
1301 2nd Ave, Suite 2800
Seattle, WA 98101-3808
Telephone: 206.223.7000
FAX: 206.223.7107

- June 8, 2023 - UCC Financing Statement filed by Zahav Asset Management LLC against Washington Security Services, Inc., Signal 88 of South Puget SO, and Sean Bradford Masterson;  July 21, 2023 - UCC Financing Statement filed by C T Corporation System, as representative against Washington Security Services, Inc. and Sean Bradford Masterson;

- August 15, 2023 - UCC Financing Statement filed by Alpine Advance 5 LLC against Washington Security Services, Inc DBA Signal 88 Security of South Puget;

- August 30, 2023 - UCC Financing Statement filed by G and G Funding Group LLC against Washington Security Services, Inc.;

- September 6, 2023 - UCC Financing Statement filed by Masean Ventures LLC against Sean Bradford Masterson, Washington Security Services Inc., Masterson Holdings LLC, Private Sean LLC, Northern Sky, LLC, Last Minute Fencing LLC, and EYEY LLC;

- September 8, 2023 - UCC Financing Statement filed by Corporation Service Company, as Representative against Washington Security Services Inc.

72. As these UCC statements demonstrate, Defendants encumbered Franchise 366 with multiple undisclosed and unauthorized loan obligations, and undisclosed corresponding liens. Defendants had already assigned and pledged those same assets to Signal to ensure repayment of the loans Signal made to Defendants.  Defendants' conduct in pledging assets in this manner to secure the third-party loans constituted a material breach of their obligations to Signal, if not fraud.

73. Further, the failure to secure consent from Signal before entering into new loan obligations is a material breach of Section (j) to the Promissory Note of the Operations Financing Agreement. (Ex. 1, Ex. B) ("Borrower shall not, without the prior consent of Lender, sell, transfer, create or allow any right, title, lien, or interest of any party (other than Lender) in any material asset of the borrower.").

74. Finally, because Defendants' undisclosed obligations and liens are material events that must be reported to Signal, Defendants' failure to report the existence of the loans, the collateral, and the liens, to Signal are material breaches of Sections (b), (d), (e), and (h) of the Promissory Note of the Operations Financing Agreement. (Ex. 1, Ex. B).

**BALLARD SPAHR LLP**
1301 2nd Ave, Suite 2800
Seattle, WA 98101-3808
Telephone: 206.223.7000
FAX: 206.223.7107

**Failure to Comply With Contractual Books and Records Audit**

75.     Upon discovering the multiple loans defendants took out without Signal's knowledge or consent, Signal made a formal request to inspect and audit the books and records of Defendants' franchise business, as provided in Section 6.8(e) of the Franchise Agreement. (Ex. 3). The Franchise Defendants refused Signal's request.

76.     Franchisee Defendants' failure to abide by an express contractual term in the Franchise Agreement is a material breach for which Signal is entitled to recover.

**Business Operations Debts to Signal**

77.     As part of Signal's franchise arrangement with the Franchise Defendants, Signal agreed to provide certain monthly amounts via a "Line of Credit," at the franchisee's request, "in order to meet the costs of conducting the normal course of Franchisee's business, provided that such costs are ordinary, reasonable, and necessary to the operation of the Franchisee's business…" (Ex. 1, Ex. B).

78.     Over the course of the business relationship between Franchisee Defendants and Signal, the Franchisee Defendants' balance owed on the Line of Credit ballooned to $1,991,807.

79.     Franchisee Defendants agreed to pay "the entire principal amount of each advance made hereunder, together with interest accrued thereon, no later than 60 days after the date of the advance." (*Id.*)

80.     In the event of a default, the Line of Credit Agreement provides that Signal shall have the right "to declare the entire unpaid balance of this Note (including principal, interest, loan fees and any other obligation) immediately due and payable and to exercise rights and remedies provided at law or in equity. Borrower agrees to pay all Lender's costs (including reasonable attorney fees) incurred in enforcing and collecting under this Note or any such loan document." (*Id.*)

81.     Franchisee Defendants defaulted on the debt owed to Signal via the Line of Credit, and Signal is entitled to the full amount due and owing under the Financing Agreement, including costs, attorneys' fees, and interest.

**BALLARD SPAHR LLP**
1301 2nd Ave, Suite 2800
Seattle, WA 98101-3808
Telephone: 206.223.7000
FAX: 206.223.7107

**Territory Purchase Loan From Signal**

82.    As noted above, Franchise Defendants purchased a geographical "territory" from Signal in which to operate on January 1, 2023. The total cost of all purchased territories was $3,133,214.24. ("Franchise Fees") (Ex. 4).

83.    Washington Security financed the Franchise Fee from Signal, at zero percent (0.00%) interest, and agreed to pay the debt off over time. (Ex. 4).

84.    The Franchise Fee Financing Agreement specifies that "Franchisee shall make monthly payments equal to 10 percent (10%) of monthly Gross revenues until the Loan is repaid, provided that the full outstanding amount owed shall be due upon termination or expiration of Franchisee's Franchise Agreement, but in any event no later than three years after execution of this Agreement." (*Id.*)

85.    The Franchise Fee Financing Agreement further states: "Upon default, Franchisee will lose all rights to the Territory (as defined in the Franchise Agreement), Franchisor may terminate Franchisee's Franchise Agreement, and Franchisor may accelerate all amounts owed hereunder." (*Id.*)

86.    Default interest accrues on all amounts owed "at a rate of 1.5% per month or the highest rate allowed by law, whichever is less." (*Id*)

87.    Franchise Defendants defaulted on the Loan, and $2,371,359 remains outstanding.

88.    After terminating Defendants' franchise, Signal mitigated its losses and resold the territory to another Signal franchisee at a significant discount. Accordingly, Signal has suffered damages of the total amount due and owing, minus the net cover amount obtained by reselling the territory, as well as pre-judgment and post-judgment interest thereupon.

**Tortious Interference With Contract and Business Expectancy**

89.    After Defendants learned of Signal's investigation into Defendants' manifold breaches and other improper conduct, Defendants responded with a tortious campaign to sabotage Signal's business and brand, and to usurp Signal's customers.

**BALLARD SPAHR LLP**
1301 2nd Ave, Suite 2800
Seattle, WA 98101-3808
Telephone: 206.223.7000
FAX: 206.223.7107

90.    Masterson and EYEY sent false, malicious, and tortious emails to Signal's customers (at least 60 of them). Not only did these emails contain disparaging falsehoods, they were nothing more than a transparent ruse for Masterson and EYEY to poach Signal's clients under false pretenses.

91.    The emails falsely asserted that Signal was "found to be noncompliant" under Washington law by government regulators, and explained that Masterson and EYEY were starting their own security company, All Time Guard, for "compliance purposes." The emails even included DocuSign links to All Time Guard's customer contract, with a request that each customer execute the contract, and an offer for a "rate lock" for 2025 if the recipient executed the new contract with All Time Guard. Attached hereto as Exhibit 8 is an example of these communications sent by Masterson and Eyey to one of Signal's customers.

92.    Defendants' ruse and malicious campaign to interfere with Signal's customer relationships achieved its intended purpose, at least in part.

93.    First, as a direct and proximate result of Masterson and EYEY's wrongful communications, Customer 1, a multi-national retail and grocery chain, decreased its business operations with Signal substantially. Historically, Customer 1 had been a reliable customer of Signal's, showing substantial and sustained growth over the course of the relationship. Customer 1 expressed satisfaction with Signal's services, and the relationship was secure and promising.

94.    Signal had a sound and reasonable basis to expect that Customer 1 would continue to engage with Signal for future security services work, and to enter new contracts with Signal for those services.

95.    Masterson and EYEY had full knowledge of Signal's valuable relationship with Customer 1, and intentionally sought to disrupt, thwart, or sabotage any additional engagements between the two companies. There is no plausible basis for Masterson and EYEY to have sent any communications to Customer 1 whatsoever. In sending such communications to Customer 1, Masterson and EYEY's sole and exclusive purpose was to interfere with Customer 1's contractual relationship with Signal, and to undermine any future growth opportunities via new contracts.

BALLARD SPAHR LLP
1301 2nd Ave, Suite 2800
Seattle, WA 98101-3808
Telephone: 206.223.7000
FAX: 206.223.7107

96.    After receipt of Masterson and EYEY's communications, Customer 1 decreased its engagement with Signal, and has continued to do so. As a result of either reputational harm to Signal, or the desire to avoid entanglement with Masterson and his antics, Customer 1 chose to engage with Signal's competitors to grow their security services.

97.    As a sizable, reliable, and valued customer, Customer 1's decreased reliance on Signal has caused substantial damages in an amount to be proven at trial.

98.    Additionally, Masterson and EYEY's tortious communications directly led to at least fifty-nine (59) other customers outright terminating their contracts with Signal.

99.    For example, Signal's former customer, Nucor Corporation, is a leading producer of steel and steel products, and the single largest recycler of steel scrap in North America.

100.    Signal had a contract with Nucor Corporation for security services at their locations, of which Masterson and EYEY were fully aware. Signal's contract with Nucor Corporation was significant, and Nucor Corporation was satisfied with the services Signal was providing. Signal had every reason to believe that its contract with Nucor Corporation was secure and would continue into the future, for the term of the agreement, and through renewals. However, that is not what happened.

101.    Masterson and EYEY's tortious communications disrupted and sabotaged Signal's relationship with Nucor Corporation, which is precisely what Masterson and EYEY intended. Whether concerned for its own reputational harm, or a desire to avoid any further entanglement with Masterson and his antics, Nucor Corporation terminated its contract with Signal and sought security services from one of Signal's competitors.

102.    The loss of the Nucor Corporation contract caused substantial economic damages to Signal in an amount to be proven at trial. Not only did Signal lose a significant source of reliable revenue, but it lost one of its marquee customers in a large and valuable industry that regularly engages security services like Signal. Accordingly, the Nucor Corporation contract was a valuable one, which Masterson and EYEY knew, and that's precisely why they sought to interfere and sabotage it.

BALLARD SPAHR LLP
1301 2nd Ave, Suite 2800
Seattle, WA 98101-3808
Telephone: 206.223.7000
FAX: 206.223.7107

103.    Although the loss of the Nucor Corporation contract was significant, it was not the full extent of the damage caused by Masterson and EYEY's malicious interference campaign against Signal's customers. At least 59 other Signal customers were the recipients of Masterson and EYEY's false and disparaging communications, and those customers terminated their contracts with Signal as a direct and proximate result of the exact same conduct described above with respect to Nucor Corporation. Each and every one of the listed companies were valuable customer engagements for Signal, whose contracts were valid and profitable, and who chose to terminate their engagements with Signal as a result of Masterson and EYEY's tortious interference.

104.    Again, Masterson and EYEY's conduct with respect to these contracts was unjustified, and willfully malicious. Masterson and EYEY's actions were purposeful, malicious, and intentional in seeking to disrupt otherwise valid and valuable contracts between Signal and its customers.

105.    All told, Signal has suffered economic damages of at least $7,500,0000 from Masterson and EYEY's tortious interferences with its contracts, with the exact amount to be proven at trial.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**(Breach of Contract – Franchise Agreement)**
**(Against EYEY, Washington Security, Northern Security)**

106.    Signal incorporates the allegations set forth in the paragraphs above, as though fully stated herein.

107.    Signal and Washington Security entered into a valid and enforceable contract, the Franchise Agreement. (Ex. 3).

108.    Washington Security subsequently transferred the rights and obligations under the Franchise Agreement and related contracts to EYEY with Signal's consent.

**BALLARD SPAHR LLP**
1301 2nd Ave, Suite 2800
Seattle, WA 98101-3808
Telephone: 206.223.7000
FAX: 206.223.7107

109. Franchisee Defendants materially breached the Franchise Agreement, including in the following ways:

- Creating and operating a separate, competitive, security service business, All Time Guard, while under contract as a Signal franchisee;

- Using Signal branding and marks in advertising and marketing All Time Guard, Defendants' competitive security services business;

- Creating a separate and competitive website for All Time Guard for the provision of security services; and

- Failing to comply with the express obligation under the Franchise Agreement to mediate this dispute, and provide other pre-litigation written notices prior to filing suit, causing Signal to incur significant attorneys' fees in litigating Defendants premature claims. This sum totals more than $900,000.

- Failing to abide by Signal's request to audit franchisee books and records.

- Breaching the confidentiality provisions of the Franchise Agreement.

110. These actions are direct and material breaches of the Franchise Agreement, including Sections 1.16, 2.2, 2.3, 2.4, 2.5, 5.7, 6.5(e), 6.6(e), 6.8(e), 6.17, 16.1, 17.1, 17.2, 19.1, 19.2, 19.3, Exhibit G (confidentiality and non-competition agreement), and Exhibit F (Subcontract Agreement).

111. Signal has fulfilled all of its material obligations under the Franchise Agreement.

112. As a direct result of the Franchise Defendants' breaches, Signal has been deprived of the benefit of the bargain under the Franchise Agreement and has incurred damages in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF

**(Breach of Contract – Operations Financing Agreement)**
**(Against EYEY, Washington Security, and Northern Sky)**

113. Signal incorporates the allegations set forth in the paragraphs above, as though fully stated herein.

114. Signal and Northern Sky LLC entered into a valid and enforceable contract, the Operations Financing Agreement. (Ex. 1). Northern Sky LLC transferred obligations in the Line

BALLARD SPAHR LLP
1301 2nd Ave, Suite 2800
Seattle, WA 98101-3808
Telephone: 206.223.7000
FAX: 206.223.7107

of Credit Agreement to Washington Security Services Inc., who then transferred its interest to EYEY. (Exs. 2, 5).

115.    Franchisee Defendants materially breached the Operations Financing Agreement in at least the following ways:

- Taking on loans from third parties without the express approval of Signal.

- Pledging assets as collateral for undisclosed and unauthorized third party loans that Franchisee Defendants assigned to Signal and gave as security to Signal.

- Failing to disclose third party loans to Signal.

- Failing to disclose third party lawsuits filed against Franchisee Defendants and Masterson.

- Failing to repay Line of Credit debts totaling $1,991,807.

These actions and omissions are direct and material breaches of at least Sections (j), (b), (d), (e), and (h) of the Promissory Note attached to the Operations Financing Agreement, as well as Exhibit A (Assignment of customer contracts to Signal).

116.    Signal has fulfilled all of its material obligations under the Operations Financing Agreement.

117.    As a direct and proximate cause of these breaches, Signal has incurred damages of at least $1,991,807, with the exact amount to be determined at trial.

### THIRD CLAIM FOR RELIEF

**(Breach of Contract – Franchise Fee Financing Agreement)**
**(Against EYEY, Washington Security, and Northern Sky)**

118.    Signal incorporates the allegations set forth in the paragraphs above, as though fully stated herein.

119.    Signal and Washington Security entered into a valid and enforceable contract, the Franchise Fee Financing Agreement (Ex. 4). Washington Security then transferred its interest in the Franchise Fee Financing Agreement to EYEY. (Ex. 5).

120.    Pursuant to the Franchise Fee Financing Agreement, Washington Security purchased a geographical territory allotment from Signal to operate its franchisee business for the

**BALLARD SPAHR LLP**
1301 2nd Ave, Suite 2800
Seattle, WA 98101-3808
Telephone: 206.223.7000
FAX: 206.223.7107

Franchise Fee price of $3,133,214.24. Washington Security financed the Franchise Fee with a zero-interest loan, to be repaid on a monthly basis.

121.    At the time Signal terminated the Franchise Agreement and all corresponding agreements with Masterson and EYEY in 2024 based on multiple defaults, $2,371,359 remained due on the loan under the Franchise Fee Financing Agreement.

122.    To mitigate its damages, Signal re-sold the territory to a third party at a substantial discount.

123.    Signal has sustained damages in the amount of the expected revenues from the Defendants' Franchise, minus the net amounts received as a result of mitigation measures taken by Signal to re-sell the territory.

124.    Signal fulfilled all of its material obligations under the Franchise Fee Finance Agreement and is therefore entitled to recover for Franchise Defendants' breaches.

## FOURTH CLAIM FOR RELIEF

### (Breach of Guaranties)
### (Against Masterson)

125.    Signal incorporates the allegations set forth in the paragraphs above, as though fully stated herein.

126.    Masterson executed the Guaranties pursuant to which he absolutely and unconditionally guaranteed to Signal all debt obligations from Northern Sky, Washington Security, and EYEY. (Ex. 6). Pursuant to the Guaranties, Masterson also agreed to be personally bound and personally liable for each and every breach of the Franchise Agreement.

127.    The Guaranties are valid and binding contracts that entitle Signal to recover personally against Masterson in the event of a default on the obligations owed by EYEY, Washington Security, and Northern Sky to Signal.

128.    As consideration, Signal agreed to loan the principal debtors significant quantities of money in order to allow those debtors to establish and operate Franchise 366.

**BALLARD SPAHR LLP**
1301 2nd Ave, Suite 2800
Seattle, WA 98101-3808
Telephone: 206.223.7000
FAX: 206.223.7107

129.    Principal debtors EYEY, Washington Security, and Northern Sky defaulted on their debt obligations under the Franchise Agreement, the Operations Financing Agreement, and the Franchise Fee Financing Agreement, and breached their obligations thereunder.

130.    Signal has been unable to recover the amounts owed from the principal debtors.

131.    Masterson, as personal guarantor, is contractually responsible for all amounts owed by the principal debtors, and he has failed to honor his guaranty obligations.

132.    Signal has suffered economic damages from its inability to collect on the amounts owed from the principal debtors, and Signal has been denied the benefit of its bargain with those entities.

133.    The principal debtors owe Signal a total of at least $3,300,000, with the exact amount to be determined at trial, including interest and any reduction for any amounts due to Signal's efforts to cover its losses.

134.    Further, as Guarantor, Masterson is liable for Signal's attorneys' fees, costs, and out-of-pocket expenses in enforcing the Guaranties. (Ex. 6).

## FIFTH CLAIM FOR RELIEF

### (Tortious Interference With Contract and Business Expectancy)
### (Against Masterson and EYEY)

135.    Signal incorporates the allegations set forth in the paragraphs above, as though fully stated herein.

136.    Signal had valid and current contractual relationships with customers and clients, including Nucor Corporation and Customer 1, as well as approximately fifty-eight (58) other customers for the provision of security services in the Seattle area.

137.    EYEY and Masterson were fully aware of these contractual relationship at all material times.

138.    Through false and malicious communications, Masterson and EYEY intentionally interfered and sabotaged Signal's contractual relationships, leading those companies to terminate their contracts with Signal, or to refuse further business with Signal via future contracts.

BALLARD SPAHR LLP
1301 2nd Ave, Suite 2800
Seattle, WA 98101-3808
Telephone: 206.223.7000
FAX: 206.223.7107

139.    Masterson and EYEY's conduct was malicious and unjustified, as there is no reasonable explanation for that conduct.

140.    Masterson and EYEY's conduct was a direct and proximate cause of damages to Signal of at least $7,500,000, with the exact amount to be proven at trial.

141.    Signal is entitled to recover from Masterson and EYEY for the damages incurred.

### SIXTH CLAIM FOR RELIEF

**(Breach of Implied Covenant of Good Faith and Fair Dealing)**
**(Against EYEY, Washington Security, and Northern Sky)**

142.    Signal incorporates the allegations set forth in the paragraphs above, as though fully stated herein.

143.    In Washington, each party to a contract has an implied duty to act in good faith and deal fairly with the other contracting parties so that each may obtain the full benefit of performance.

144.    By acting in bad faith and otherwise refusing to exercise any discretion under the agreements at issue in good faith, including failing to cease the vexatious litigation in the King County Action and forcing Signal to incur significant costs in defending against that premature action, Defendants breached their implied duty of good faith and fair dealing implied in all contracts at issue in this litigation.

145.    Signal has been damaged as a direct and proximate result of Defendants' breach of the implied covenant of good faith and fair dealing in an amount to be determined at trial.

### SEVENTH CLAIM FOR RELIEF

**(Trade Secret Misappropriation, 18 U.S.C. § 1836, et seq.)**
**(Against Masterson and EYEY)**

146.    Signal incorporates the allegations set forth in the paragraphs above, as though fully stated herein.

147.    Signal has valid and enforceable trade secrets in Signal's proprietary business resources, including customer lists, business strategy documents, business plans, and business

BALLARD SPAHR LLP
1301 2nd Ave, Suite 2800
Seattle, WA 98101-3808
Telephone: 206.223.7000
FAX: 206.223.7107

development databases. These resources contain non-public information about customers, potential customers, and about Signal's business operations.

148.    Signal's trade secrets are directly related to Signal's business in providing competitive security services to customers in interstate commerce.

149.    Signal's trade secrets are secret. Signal's trade secrets are not generally known, and are not public in any way. Signal's trade secrets are kept secure via confidentiality agreements and private logins, accessible only to Signal's employees and franchisees. These measures ensure that Signal's trade secrets are not leaked or exploited for competitive purposes.

150.    Signal derives significant value from the secrecy of the trade secrets, including competitive advantages in delivering premier security services, winning new business, and holding onto existing business. The value of Signal's trade secrets derives from its contents, organization, breadth, depth, and the integration between Signal's business model and the information contained therein. Specifically, Signal's trade secrets contain information regarding current customers, their needs, goals, and identified vulnerabilities with respect to security services. It also includes financial information about customers and Signal's business in servicing those customers. It also includes strategic information regarding the provision of security services in various sectors, industries, and geographies. These attributes provide Signal with a competitive advantage in the market for security services, and the market value of that information can and would assist competitors in unfairly competing with Signal for Signal's customers, and potential new customers. Further, any disclosure of the trade secrets could jeopardize the security of Signal's customers.

151.    As Signal franchisees, EYEY and Masterson were fully aware, or had adequate reason to know, of the value of the trade secrets, and had access to them as a result of their execution of confidentiality agreements and business needs.

152.    EYEY and Masterson knew, or had adequate reason to know, that downloading the trade secrets and using them for any purpose other than Signal's approved business operations was improper, unauthorized, and unlawful.

BALLARD SPAHR LLP
1301 2nd Ave, Suite 2800
Seattle, WA 98101-3808
Telephone: 206.223.7000
FAX: 206.223.7107

153.    On or around September of 2024, after the enactment of the Defend Trade Secrets Act in 2016, EYEY and Masterson improperly accessed, downloaded, and absconded with Signal's trade secrets for personal use and gain.

154.    EYEY and Masterson had a duty to maintain the secrecy of Signal's trade secrets, and violated it, through improper means.

155.    EYEY and Masterson misappropriated Signal's trade secrets in service of an improper security business, All Time Guard, that EYEY and Masterson established to compete directly with Signal, all the while being a Signal franchisee under contract. EYEY and Masterson knew, or had reason to know, that misappropriating Signal's trade secrets, which are defined in the Franchise Agreement, subject to confidentiality agreements, and critical to Signal's competitive business operations, was improper. EYEY and Masterson further knew, or should have known, that misappropriation of Signal's trade secrets would cause Signal competitive harm, and economic damages.

156.    EYEY and Masterson then used Signal's trade secrets in designing a competing business, as well as contacting Signal's customers and potential customers in acts of sabotage and solicitation for the provision of security services that were directly adverse to Signal's interest.

157.    Based on EYEY and Masterson's improper conduct and misappropriation was willful, malicious

158.    Pursuant to 18 U.S.C. § 1836(b), Signal is entitled to damages for the misappropriation of trade secrets including, but not limited to, damages for actual lost, unjust enrichment, exemplary damages and reasonable attorney fees and costs.

## EIGHTH CLAIM FOR RELIEF

### (Unjust Enrichment)
### (Against All Defendants)

159.    Signal incorporates the allegations set forth in the paragraphs above, as though fully stated herein.

160.    Defendants borrowed approximately $6,354,973 from Signal.

BALLARD SPAHR LLP
1301 2nd Ave, Suite 2800
Seattle, WA 98101-3808
Telephone: 206.223.7000
FAX: 206.223.7107

161.   Defendants have benefited from the exclusive possession and retention of those funds.

162.   Defendants' possession and retention of those funds have come at the expense of Signal.

163.   Because Defendants have failed to compensate Signal in the form of services in exchange for those funds, or repayment of those funds, Defendants' possession and retention of those funds is unjust.

164.   The circumstances of Defendants' possession and retention of those funds is an inequitable result for which Signal is entitled to relief.

165.   Signal is entitled to damages in the amount of all funds loaned to Defendants, to date, which have not been repaid and therefore remain unjustly withheld.

**JURY TRIAL**

166.   Signal demands a trial by jury.

**ATTORNEY'S FEES AND COSTS**

167.   Signal is entitled to recover its reasonable attorneys' fees, expenses, and costs incurred herein, as well as attorneys' fees, expenses, and costs incurred prior to this litigation as a result of Defendants' conduct, including fees and costs to which Signal is entitled under the various agreements at issue, such as the Franchise Agreement, Guaranties, Operations Financing Agreement, Franchise Fee Financing Agreement, First Consent to Transfer, Second Consent to Transfer, and applicable law.

**PRAYER FOR RELIEF**

Signal prays for the following relief:

1.   On its FIRST CLAIM FOR RELIEF, judgment in favor of Signal and against Franchise Defendants, jointly and severally, in favor of Signal for damages in an amount to be proven at trial, and Signal's reasonable attorney fees and costs.

PLAINTIFF'S FIRST AMENDED COMPLAINT – 27
Case No. 2:25-cv-01156-BJR

**BALLARD SPAHR LLP**
1301 2nd Ave, Suite 2800
Seattle, WA 98101-3808
Telephone: 206.223.7000
FAX: 206.223.7107

2.      On its SECOND CLAIM FOR RELIEF, judgment in favor of Signal and against Franchisee Defendants for breach of the Operations Financing Agreement in the amount of $1,991,807, plus prejudgment interest, and Signal's attorney fees and costs.

3.      On its THIRD CLAIM FOR RELIEF, judgment in favor of Signal and against Franchisee Defendants for breach of the Franchise Fee Financing Agreement in the amount of $4,363,166, plus prejudgment interest, and Signal's reasonable attorney fees and costs.

4.      On its FOURTH CLAIM FOR RELIEF, judgment in favor of Signal and against Masterson for breach of the personal guaranty the amount of $4,363,166, plus prejudgment interest and Signal's reasonable attorney fees and costs.

5.      On its FIFTH CLAIM FOR RELIEF, judgment in favor of Signal and against Masterson and EYEY in the amount of not less than $7,500,000.

6.      On its SIXTH CLAIM FOR RELIEF, judgment in favor of Signal and against defendants in an amount to be proven at trial.

7.      On its SEVENTH CLAIM FOR RELIEF, judgment in favor of Signal and against Masterson and EYEY for actual losses, unjust enrichment, exemplary damages in amounts to be proven at trial, and reasonable attorney fees and costs.

8.      On its EIGHTH CLAIM FOR RELIEF, judgment in favor of Signal and against Defendants for unjust enrichment in an amount to be proven at trial, and reasonable attorney's fees and costs.

9.      For all costs to which Signal is entitled under applicable law.

10.     For interest on the entire amount of each judgment against Defendants at the statutory rate through the date of judgment and after the date of judgment until paid.

11.     Any other relief the Court deems just and equitable.

**BALLARD SPAHR LLP**
1301 2nd Ave, Suite 2800
Seattle, WA 98101-3808
Telephone: 206.223.7000
FAX: 206.223.7107

DATED:  July 14, 2025

BALLARD SPAHR LLP


By  *s/ Jennifer Beyerlein*
Jennifer Beyerlein, WSBA No. 35754

By  *s/ Pilar French*
Pilar French, WSBA No. 33300

By  *s/ Daniel A. Kittle*
Daniel A. Kittle, WSBA No. 43340

1301 2nd Ave, Suite 2800
Seattle, WA 98101-3808
Telephone: 206.223.7000
beyerleinj@ballardspahr.com
frenchp@ballardspahr.com
kittled@ballardspahr.com

*Attorneys for Plaintiff*

BALLARD SPAHR LLP
1301 2nd Ave, Suite 2800
Seattle, WA 98101-3808
Telephone: 206.223.7000
FAX: 206.223.7107